## THOMAS *v.* ATKINSON.

SPECIAL AGENT.—*Payment.*—Where property is sold to the special agent of an undisclosed principal, on the credit of the agent, the principal, in a suit against him by the seller to recover the price, may show payment in full to the agent as a defence.

SAME.—*Sale on Credit.*—Where a special agent purchases on credit, without disclosing his agency and without authority to purchase on credit, the principal is not liable, after having paid the agent.

APPEAL from the Carroll Circuit Court.

PETTIT, J.—This suit was brought by the appellee against

the appellant.   The complaint states, that the appellant pur-
chased of the appellee twenty thousand eight hundred and
sixty-four feet of black walnut lumber, for which appellant
agreed and promised to pay at the rate of thirty-three dollars
per thousand feet; that three hundred and eighty dollars had
been paid, leaving due and unpaid three hundred and fifty
dollars, for which judgment was demanded.

Answer, first, general denial; second, payment.  Reply
of general denial to second paragraph of the answer.   Trial
by the court; finding for the plaintiff, appellee, in the sum
of three hundred and eight dollars and thirty-seven cents.

Motion for a new trial, for the following reasons:

First.  The finding is contrary to law.

Second.  The finding of the court is contrary to the evi-
dence.

Third.  The finding of the court is not sustained by suffi-
cient evidence.

Fourth.  For error of law occurring at the trial, and ex-
cepted to by the defendant at the time, in this, to wit: first,
the court allowed improper evidence over the objection
pointed out at the time to the court; second, the court re-
jected proper evidence offered by the defendant; third, the
court refused to receive material and proper evidence offered
by the defendant.

This motion was overruled; exception; and judgment on
the finding was rendered.

The whole evidence given, offered, and refused, is as fol-
lows.   For plaintiff:

Josephus Atkinson, the plaintiff, testified that some time
during the latter part of November, 1868, one William M.
Munday came to him and stated that he wished to buy some
walnut lumber, and would pay the plaintiff thirty-three dol-
lars per thousand feet; that he accepted the offer, and agreed
to deliver the lumber to Munday at the railroad; that he did
not know the defendant at that time; that Munday advanced
him one hundred dollars on the lumber; that in accordance
with his contract with Munday, he afterward delivered to

Munday twenty thousand eight hundred and sixty-four feet, for which Munday had paid him in all three hundred and eighty dollars, leaving a balance due of three hundred and eight dollars; that soon after the lumber had been delivered at the railroad, he met the defendant, told him the bargain he had made with Munday, and requested the defendant to tell Munday when he should see him that the lumber was there, which the defendant agreed to do; that in a few days Munday went and measured the lumber and shipped it to the defendant at Toledo, Ohio; that Munday then told the plaintiff to go to Delphi, and he would pay him for the lumber, but it was agreed that Munday should send the money by express in a day or two; that about the middle of May, 1869, Munday having failed to send the money as he had agreed to do, the plaintiff went to Delphi to know the reason of Munday's failure to send the money; that previous to going he had received a letter from Munday, stating that the defendant had not paid him, Munday, for the lumber; that while at Delphi the plaintiff met the defendant and stated to him what Munday had written, and the defendant said it was not true, as he had paid Munday in full for the lumber; when the plaintiff went to see Munday, but could get nothing out of him for the lumber; that the next time he met the defendant he told the defendant that he should look to him for his pay, because it was measured, marked, and shipped in his name; and that this was several days after he met the defendant in Delphi, when the defendant told him that he had paid Munday in full for the lumber.

On cross examination, the plaintiff testified that when he contracted with Munday for the sale of the lumber, he did not know the defendant; that his contract with Munday was not in writing, because he then had great confidence in him, as he had known him a long time; that he made no charge against the defendant for the lumber; that the defendant never agreed or promised to pay him for the lumber; that when, after failing to get his pay from Munday, he told the defendant he should hold him responsible for the lumber,

the defendant denied that he was liable; that he was not aware that the defendant had ever recognized Munday as his agent, and that he had made no inquiries on that point of any one; that after he had failed to get the balance due him from Munday, he had addressed a letter, dated June 7th, 1869, to the defendant, stating that he wanted his money, and that the defendant, as an honorable man, ought to see that he got his pay; in answer to which the defendant maintained that he was not indebted to him.

George W. Hubbard testified that he was in the lumber trade, and met the defendant in the winter of 1868 and 1869, when the defendant stated that he was to get from Munday the plaintiff's lumber, but he did not state how, or with whom he had contracted for it.

David E. Emely testified that he was in Rockfield the morning that Munday went to measure the lumber in question, when the defendant told Munday to go and measure the lumber and ship it to him at Toledo, Ohio, and he would take it at Munday's measurement, and also told Munday to tell the plaintiff to go to Delphi, after the lumber was measured, and get his pay from Munday.

William M. Munday testified that some time in November, 1868, he told the defendant he could buy the plaintiff's lumber if the defendant would advance him, Munday, money on it, and the defendant advanced him, Munday, one hundred and twenty-five dollars; that he was acting as the agent of the defendant in the purchase of this lot of lumber; that he advanced the plaintiff one hundred dollars on it; that when the lumber was ready to be measured at the railroad, the defendant told him to go and measure it, and he, the defendant, would pay him, Munday, for it; that he measured it and had it shipped to the defendant at Toledo.

On cross examination, this witness testified that he was never the agent of the defendant except in the purchase of this particular lumber; that he did not know what facts were necessary to constitute an agency; that he had a writ-

ten contract with the defendant for lumber, and that the following was a copy of the contract:

"CAMDEN, CARROLL COUNTY, IND., Nov. 26th, 1868.

"W. M. Munday, of Rockfield, Indiana, contracts to A. J. Thomas and E. C. Rice, of Camden, Carroll county, Indiana, two hundred thousand feet of black walnut lumber, said lumber to be from one to four inches thick, or as the said Thomas and Rice may direct, and from ten to sixteen feet long, and six inches and upwards in width; to be free from hearts, shakes, and rotten knots, and good merchantable lumber, subject to Wheelock and Tuttle's inspection, at Toledo, Ohio. The said Munday agrees to deliver one hundred thousand feet of said lumber on cars at Rockfield or vicinity, at his own expense, by the first of June, 1869, and one hundred thousand feet by the first of October, 1869. The said Thomas and Rice agree to pay the said Munday thirty-five dollars per thousand feet, when said lumber is delivered aboard of cars.

"WILLIAM M. MUNDAY."

That on this contract the defendant advanced to him the one hundred and twenty-five dollars; that he told the defendant he wanted to advance this one hundred and twenty-five dollars to the plaintiff; that he only gave the plaintiff one hundred dollars of it, and the balance he kept; that the contract was a sham; that he did not know that Rice had anything to do with it; that he read it carefully before signing; that he did not know that Rice was a partner of the defendant; that he did not know what compensation he was to receive for his services as agent; that the defendant never held him out to the world as an agent; that he never bought any other lumber as the agent of the defendant; that the defendant never authorized him to represent to the plaintiff that he was the defendant's agent; that the defendant did not authorize him to buy lumber on the credit of the defendant; and that the plaintiff had not threatened him with a criminal prosecution in the event of his failure to obtain a judgment against the defendant.

Thomas *v.* Atkinson.

Defendant's evidence:

Andrew J. Thomas, the defendant, testified that Munday was never his agent for the purchase of lumber from the plaintiff or any other person, nor was ever Munday his agent for the transaction of any business of any character; that he did not know that Munday was representing himself as his agent, or that he claimed to be his agent, until after the plaintiff had informed him that Munday had failed to pay him; that the only contract he ever had with Munday was the written contract executed on the 26th day of November, 1868, about which Munday testified; that the contract was not a sham, but was made in good faith, and the lumber sold by the plaintiff to Munday was applied by Munday on that contract; that Rice and the witness, at the time of the execution of the contract, were in partnership in the lumber business, and Munday knew the fact, for Rice wrote the contract in Munday's presence, and assisted in arranging its terms; that he was not at that time, nor since, engaged in any business except as a member of the firm of Thomas & Rice; that at that time he did not know the plaintiff, and only made his acquaintance in May, 1869, when the plaintiff requested him that he should inform Munday, when he should next see him, that he had some lumber at the railroad for him (Munday), and he agreed to do so; that this lumber was measured and shipped to their firm, at Toledo, Ohio; that on the 12th day of May, 1869, he met Munday at Delphi, and in about a week afterward he met the plaintiff there, when the plaintiff inquired as to the whereabouts of Munday, stating that Munday had not paid him, as he had agreed to send the money by express; that the plaintiff did not ask or intimate that the witness should pay him for the lumber; the first intimation that the witness had of such an expectation being entertained was in the letter from the plaintiff to him, on the 7th of June, 1869; that in a few days after that letter was received he met the plaintiff, who informed him that Munday had deceived him, and he could not get his money; that he had never promised, directly or

indirectly, that he would pay the plaintiff or see that he was paid; for he had no dealings with him in any shape; and that he had stated to the witness Hubbard that he would get the plaintiff's lumber from Munday, who had contracted with the plaintiff for it.

Here the defendant offered to testify that on the 12th day of May, 1869, before the plaintiff had informed him that Munday had acted in bad faith and had failed to pay him, the defendant and Munday made a complete settlement of all accounts and demands between them, which included the lumber from the plaintiff; when it was found there was due Munday two hundred and eight dollars and fifty-four cents, which sum the defendant then paid Munday, which closed the account between them; and that the state of the account had not since changed. This testimony was excluded by the court, and the defendant excepted to the ruling.

Elijah C. Rice testified that he was a partner of the defendant, and was in November, 1868, when the contract referred to by the witness Munday and the defendant was executed; that he wrote the contract in the presence of Munday, and assisted in arranging its terms; and that Munday first spoke to him about it, and said that he desired to make such a contract for lumber; that he never heard or knew of Munday claiming to be the agent of their firm, or the agent of the defendant, until after Munday had failed to pay the plaintiff for his lumber; and that he was present with the defendant and Munday on the 12th day of May, 1869.

Here the defendant offered to prove by this witness that on said 12th day of May, 1869, Munday, the defendant, and the witness had a full settlement of all their business transactions, including the lumber from the plaintiff, when a balance of two hundred and eight dollars and fifty-four cents due Munday was then paid him, which closed the accounts between them, and the state. of the account has not since changed, and the lumber from the plaintiff was applied on the contract referred to without objections. This testimony

Thomas *v.* Atkinson.

was also excluded by the court, and proper exceptions taken by the defendant.

This was all the evidence given or offered in the case. In an able and learned brief for the appellant, a reversal of the judgment is asked and urged, for two reasons; first, because the finding of the court was not sustained by the evidence; second, because the court rejected material and proper evidence offered by the appellant. Upon a mere preponderance of evidence we cannot reverse a judgment below. This is well settled by a long line of decisions of this court; and for the reasons, among others, that we only see the evidence as it is written, in a bill of exceptions, while the jury and court below meet and see the witnesses face to face, see and observe their actions, and may have divined their motives, prevarication, readiness or hesitancy in answering questions; but when, as in this case, there is absolutely no evidence to support the finding upon any known rule or law of evidence, it is our duty to reverse the judgment.

The whole evidence taken together thoroughly and effectually excludes the idea of Munday's agency. But, assuming all that is claimed by the appellee to be true, Munday was only an agent for the purchase of this particular lumber, and was therefore a special agent, with no authority, according to his own testimony, to buy the lumber on credit. Upon this theory of the case, the appellant was clearly not liable, for the agent in buying on credit exceeded his authority, as he himself testified. In support of this position, we refer to the familiar principle governing this class of agencies. The principle is thus stated by Judge STORY, in his Commentaries on the Law of Agency, sec. 126:

"Before quitting this subject of the nature and extent of the authority of agents, it seems proper to refer again to what has been already incidentally stated, the distinction commonly taken between the case of a general agent and that of a special agent, the former being appointed to act in his principal's affairs generally, and the latter to act con-

cerning some particular object. * * * * In the latter case, if the agent exceeds the special and limited authority conferred on him, the principal is not bound by his acts; but they become mere nullities, so far as he is concerned; unless, indeed, he has held him out as possessing a more enlarged authority."

The author further says, sec. 133, that "where the agency is not held out by the principal, by any acts, or declarations, or implications, to be general in regard to the particular act or business, it must from necessity be construed according to its real nature and extent; and the other party must act at his own peril, and is bound to inquire into the nature and extent of the authority actually conferred. In such a case, there is no ground to contend that the principal ought to be bound by the acts of the agent, beyond what he has apparently authorized; because he has not misled the confidence of the other party, who has dealt with the agent. * * * The duty of inquiring, then, is incumbent on such party, since the principal has never held the agent out as having any general authority whatsoever in the premises; and, if he trusts without inquiry, he trusts to the good faith of the agent, and not to that of the principal."

And in Smith Mercantile Law, 173, after discussing the powers of a general agent to bind his principal in all matters coming within the general scope of his implied authority, the author says that "the rule is directly the reverse concerning a particular agent, that is, an agent employed specially in one single transaction; for it is the duty of the party dealing with such an one to ascertain the extent of his authority; and if he do not, he must abide the consequences."

The same doctrine has been held by our Supreme Court, in *Pursley* v. *Morrison*, 7 Ind. 356, where the court say: "Where parties are sought to be charged for the act of a special, and not a general agent, it must be shown that the act was done within the scope of the agency."

The case of *Reitz* v. *Martin*, 12 Ind. 306, was an action to

recover of the purchaser certain personal property which had been sold by an agent of the plaintiff, who had been employed to drive stock from one place to another. The stock became foot-sore and unable to travel, and the agent made the sale. The court held that the agent had no power to sell the stock, and that the owner might recover the property from the purchaser. We quote from the opinion of the court: "The general rule is, that the authority of the agent, of whatever description, must be strictly pursued; otherwise, the principal, if his agent be a special one, will not be bound. And if the principal has never held the agent out as having any general authority whatever in the premises, it is the duty of one purchasing from him to inquire; and if he trusts without inquiry, he trusts to the good faith of the agent, and not of the principal."

There is no conflict in the authorities; and it is manifest that in taking either view of the evidence as to the pretended agency, the appellant was not liable for the unauthorized acts of Munday.

The appellant complains of the ruling of the court in rejecting material and proper evidence offered by him. If Munday was the agent of the appellant in the purchase of the lumber, then the facts which the appellant offered to prove were material in establishing his defence. The evidence shows, as before stated (if it shows anything), that Munday was merely a special or particular agent in this single transaction with the appellee. It also shows that the credit was given to Munday, and not to the appellant; that Munday made two or three partial payments on the lumber; that he did not disclose his character as agent at the time of the purchase; that the appellee looked alone to Munday for his pay, and only ceased his endeavors in that direction after it became manifest that Munday had deceived him, and did not intend to pay him; that the appellee then discovered that the appellant was liable, and addressed him a letter to that effect, and informed the appellant that Munday had

Thomas *v.* Atkinson.

acted in bad faith, and he could get nothing out of him. The appellant then offered to prove that before the appellee had written him the letter referred to, and before the appellee had informed him that Munday had failed to pay him for the lumber, the appellant and Munday had made a complete settlement of all accounts and demands between them, which included the lumber from the appellee, when it was found there was a balance due to Munday, which the appellant then paid him, and which closed the account between them; and that the state of their accounts had not since changed. The court did not permit the appellant to prove these facts, and we hold that such ruling was error, and we will let the authorities speak for us.

In 1 Parsons Contracts, 62, it is said, that "in the case of a simple contract, an undisclosed principal may show that the apparent party was his agent, and may put himself in the place of his agent, but not so as to affect injuriously the rights of the other party. * * By parity of reasoning, an undisclosed principal, subsequently discovered, may be made liable on such contract; but, in general, subject to the qualification that the state of the account between the principal and agent is not altered to the detriment of the principal."

The case of *Thomson* v. *Davenport*, 9 B. & C. 78, is a case in point, and the doctrine is very ably and fully expounded by Lord TENTERDEN, who said: "I take it to be a general rule, that if a person sells goods (supposing at the time of the contract he is dealing with a principal), but afterward discovers that the person with whom he has been dealing is not the principal in the transaction, but agent for a third person, though he may in the meantime have debited the agent with it, he may afterward recover the amount from the real principal; subject, however, to this qualification, that the state of the account between the principal and the agent is not altered to the prejudice of the principal."

In the same case, BAYLEY, J., said: "If the principal has paid the agent, or if the state of the accounts between the agent here and the principal would make it unjust that the

seller should call on the principal, the fact of payment, or such a state of accounts, would be an answer to the action brought by the seller, where he had looked to the responsibility of the agent.   *   *   It is said, that the seller ought to have asked the name of the principal, and charged him with the price of the goods.   By omitting to do so, he might have lost his right to claim payment from the principal, had the latter paid the agent, or had the state of the accounts between the principal and the agent been such as to make it unjust that the former should be called upon to make the payment.   But, in a case circumstanced as this case is, where it does not appear but that the man who has had the goods has not paid for them, what is the justice of the case?   That he should pay for them to the seller, or to the solvent agent, or to the estate of the insolvent agent, who has made no payment in respect of these goods?   The justice of the case is, as it seems to me, all on one side, namely, that the seller shall be paid, and the buyer (the principal) shall be the person to pay him, provided he has not paid anybody else."

The case cited is approvingly quoted in Story on Agency, sec. 291, where, after discussing the general doctrine of the liability of the principal in such cases, it is added, that "there is this qualification, however, annexed to such liability of the principal, that nothing has, in the meantime, passed between the principal and the agent to alter the state of their accounts, or otherwise to operate injuriously to the principal, if he has acted in the confidence that exclusive credit was given to the agent; and, moreover, that there has been no laches on the part of the creditor."

That the evidence in the case at bar not only tends to establish, but does conclusively establish the fact that the credit was given to Munday, there can be no question.   But if the evidence even tends to that conclusion, it was error for the court to reject the testimony offered, if the authorities cited mean anything.   The contract was made with Munday, who did not disclose his agency; no charge was made against the appellant; the appellee and the appellant

were entire strangers to each other; the appellee "had great confidence in Munday," whom he had known for a long time, and for a long time he looked to Munday alone for the balance due him; the appellant had never held Munday out as his agent, whereby he could be charged with his acts; and, aside from the testimony of the appellee himself, the legal and natural presumption is that the credit was given to Munday. In support of this position, we refer to the very able American note to the case of *Thomson* v. *Davenport, supra,* in 2 Smith Lead. Cas. 358, where it is said, that, "as a general rule, contracts made by an agent as such, and within the scope of his authority, are binding on the principal, and not on the agent. This results from the natural inference, that those who merely stipulate on behalf of others, do not mean to make themselves personally answerable, and that the burden of the contract ought to be borne by him who is to reap the benefit. When, however, goods are bought, or stipulations of any sort made by an agent for an unknown principal, this inference is repelled by the equally natural presumption, that the other party to the transaction relied on the solvency of the agent, whom he knew, rather than on that of the principal, of whose character and condition he was ignorant."

But we refrain from a further citation of authorities. Does the justice of the case at bar require that the appellant shall again pay for what he bought, under a written contract, from Munday? He did no act which was calculated to deceive the appellee, who was a stranger to him. If the appellee was deceived at all, it was by Munday, in whom he had such great confidence, and whom he had favorably known so long. In good faith, the appellant had paid Munday; and upon the theory of the appellee in seeking to hold the appellant liable for a debt which Munday contracted, the court ought to have permitted the appellant to prove the state of the accounts between himself and Munday.

If the court committed no error, then the authorities cited

and the reasons of the law are no longer useful, and should be consigned to oblivion and forgetfulness.

It was error to find as the court did and to overrule the motion for a new trial.

The judgment is reversed, at the costs of the appellee, with instructions to grant the motion for a new trial.

*J. H. Gould*, for appellant.